**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE**

CYNTHIA WIELAND,

    Plaintiff,

v.

ARLINGTON COMMUNITY SCHOOLS
BOARD OF EDUCATION,

    Defendant.

Case No. _____

## COMPLAINT

Plaintiff Cynthia Wieland sues Defendant Arlington Community Schools Board of Education ("Board of Education") for retaliation in violation of Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681. Plaintiff also sues for relief on her supplemental state law claim under the Tenure Law, Tenn. Code Ann. §§ 49-5-501 *et seq.*, because of her dismissal from her position as a teacher in the Arlington Community Schools. For her causes of action, Plaintiff states:

### Parties

1. Plaintiff is a citizen and resident of Arlington, Shelby County, Tennessee.

2. Defendant Board of Education is a local education agency and is responsible under Tenn. Code Ann. § 49-2-203(a)(2) for the management and control of the schools that comprise the Arlington Community Schools located in Arlington, Shelby County, Tennessee. The Arlington Community Schools school district managed and controlled by Defendant Board of Education is a program or activity that receives federal funds.

3.      Defendant Board of Education employs a Superintendent, Jeff Mayo. Superintendent Mayo is the statutory agent of Defendant Board of Education and is charged by Tenn. Code Ann. § 49-2-301(b)(1)(A) with the duty to act for Defendant Board of Education in seeing that the laws relating to the schools are faithfully executed.

## Jurisdiction and Venue

4.      This is an action to redress Defendant's retaliation against Plaintiff because Plaintiff complained of discrimination by Defendant's agents and officials against Plaintiff's son, a student at Arlington High School, in violation of Title IX of the Education Amendments of 1972 ("Title IX), 20 U.S.C. §§ 1681 et seq., and its implementing regulation, 34 C.F.R. Part 106, which prohibit discrimination on the basis of sex in any education program or activity receiving Federal financial assistance. Retaliation against a person because she has complained of sex discrimination is a form of intentional discrimination on the basis of sex in violation of Title IX. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173-74 (2005). The implied right of action under Title IX therefore includes retaliation claims. *Id.* at 174; *Bose v. Bea*, 947 F.3d 983, 988 (6th Cir. 2020). This Court has jurisdiction over Plaintiff's Title IX retaliation claim under 28 U.S.C. §§ 1331 and 1343.

5.      This also is an action to review the merits of Plaintiff's dismissal by Defendant under the Tenure Law pursuant to the state law judicial review mechanism in Tenn. Code Ann. § 49-5-513, under which the Court reviews Defendant's decision to dismiss Plaintiff *de novo* on the record of the administrative dismissal hearing, subject to the introduction of additional evidence by Plaintiff to establish arbitrary or capricious action or a violation of Plaintiff's statutory or constitutional rights by Defendant. Tenn. Code Ann. § 49-5-513(g). This Court has supplemental jurisdiction over Plaintiff's state law claim under the Tenure Law under 28 U.S.C. § 1367.

2

6.      Plaintiff resides in Shelby County, Tennessee; Defendant is in Shelby County, Tennessee; and all the events giving rise to this action occurred in Shelby County, Tennessee. Venue is proper in this Court.

**Facts**

7.      Plaintiff is a licensed Tennessee public school teacher. Plaintiff earned a Bachelor of Music Education degree, *magna cum laude*, from Ouachita Baptist University in 1995, graduating with a 3.90 G.P.A. She earned a Master of Education degree, with a major in Education Administration, from Grand Canyon University in 2008, graduating with a 4.00 G.P.A. Plaintiff began her Tennessee teaching career as a Grade 6-8 music teacher and Grade 7 remedial reading teacher in the Memphis City Schools in the 1996-1997 school year. She taught continuously in the Memphis City Schools for six years, through the 2001-2002 school year. She returned to the Memphis City Schools for the 2004-2005 school year, and then moved to the Shelby County Schools at the beginning of the 2005-2006 school year. Plaintiff taught continuously in the Shelby County Schools for nine years, through the 2013-2014 school year. She taught in the Bartlett City Schools for three years, from 2014-2015 through 2016-2017.

8.      Plaintiff began working in the Arlington Community Schools effective August 1, 2018, as a theatre teacher at Arlington High School. On August 25, 2020, Plaintiff attained tenure as a teacher in the Arlington Community Schools. Plaintiff continued as a theatre teacher at Arlington High School until her involuntary dismissal by Defendant effective January 31, 2024.

9.      Plaintiff's work as a teacher in the Arlington Community Schools was excellent. Plaintiff received very good evaluations of her work. She was a "Level 5" teacher, the highest level a teacher can attain under Tennessee's teacher evaluation system. In the Spring 2022 Plaintiff received the Inspiring Teacher Award, an award given as part of the Orpheum Theatre's High

School Musical Theatre Awards. Plaintiff was selected from among musical theatre teachers across 38 participating schools over three states for this award given to a dedicated theatre teacher who educates, encourages, and inspires students on a daily basis. Prior to the events giving rise to her dismissal, Plaintiff had never been the subject of any sort of employee discipline.

10.    Plaintiff is the single mother of three children. Her youngest child, Max, still lives at home and is a senior at Arlington High School. Max was borne as Mary Elizabeth Wieland on July 7, 2006. When Max was in the eighth grade, he informed Plaintiff that he self-identified as a boy. After a lengthy discussion between Plaintiff, Max, and Max's siblings, Max began his journey of living as transmasculine or transgender.

11.    On April 6, 2023, Plaintiff, in her capacity as Max's mother, sent an email to the Arlington High School principal, Mr. Shannon Abraham, to request that her child be addressed and listed as Max and not his "dead name" Mary. Since Plaintiff was contacting Mr. Abraham in her capacity as a parent and not as an employee, she sent the email using her personal "gmail" email address and not her Arlington Community Schools employee email address. Plaintiff stated in the email that Max already was being denied the ability to use the restroom of the gender with which he identified. Plaintiff also stated in the email that Max had been called by his "dead name" by attendance teachers during STRIPES/TIGER WEEKS and by substitute teachers using PowerSchool rosters. Plaintiff also stated that she had been told by the school staff members that students' names as they appeared on student birth certificates would be used not only in print on diplomas but also when the students were called to receive their diplomas at the graduation ceremony. Plaintiff explained that the use of Max's "dead name" was detrimental to his well-being and caused him extreme mental and physical stress and illness. Plaintiff did not ask that school officials alter Max's name on any official school records, including his graduation diploma; but

she did request that school officials use the name "Max" for her child when calling his name out at graduation the following Spring 2024 and on forward-facing documents. Plaintiff's request was denied by Defendant's Title IX coordinator, Jeremy Yow.

12.    When Plaintiff learned that her request had been denied, she filed a complaint of discrimination under Title IX with the U. S. Department of Education's Office for Civil Rights ("OCR") [**Exhibit 1**]. On May 16, 2023, the OCR sent Plaintiff a letter acknowledging the opening of Plaintiff's allegations for an investigation [**Exhibit 2**]. Upon information and belief, the OCR commenced an investigation of Plaintiff's allegations and notified Defendant and/or Defendant's statutory agent Superintendent Mayo of Plaintiff's allegations.

13.    Max achieved an excellent composite score of 33 on the 2023 American College Testing (ACT). To understand how outstanding Max's achievement was, out of the highest possible score of 36, the average composite score nationally was 19.5; and the average composite score in Tennessee was 18.4. https://www.ontocollege.com/average-act-score/ (last accessed February 24, 2024).

14.    On Thursday August 24, 2023, Arlington High School officials hung five large banners or posters throughout the school honoring some students for their achievements, including outstanding achievement on the ACT. Max's name was included on the posters for his achievement on the ACT. However, instead of using the name Max, the posters identified Max by his "dead name," Mary.

15.    Shortly after noon on August 24, 2023, Plaintiff informed Arlington High School principal Shannon Abraham that Max was very upset about the use of his "dead name" on the posters. Mr. Abraham promised Plaintiff that he would look into the matter. Later that school day, Mr. Abraham told Plaintiff that the posters were being taken down. When Plaintiff responded that

she hated for Mr. Abraham to have to remove every poster, Mr. Abraham responded that he wanted to "take care of Max."

16.    However, later on August 24, 2023, shortly before a school open house began, Mr. Abraham informed Plaintiff that only two options were available: either the posters would be replaced with Max still identified by his "dead name" Mary, or Max's name would be removed entirely from the posters. Mr. Abraham informed Plaintiff that this was his decision based on the determination by Title IX coordinator Jeremy Yow that Max's preferred name could not be used on "student records."

17.    On Friday August 25, 2023, Plaintiff sent an email from her personal email address to school principal Shannon Abraham, with copies to Title IX coordinator Jeremy Yow and Superintendent Jeff Mayo. In her email, Plaintiff recounted her exchanges with Mr. Abraham the previous day regarding the posters. Plaintiff pointed out that the posters were not "student records" and again asked that Max's chosen name, and not his "dead name," be displayed on the posters.

18.    Shortly after 3:00 p.m. on the afternoon of Friday August 25, 2023, Superintendent Mayo responded to Plaintiff via email. After a statement of congratulations to Plaintiff and "your child" for an "outstanding" and "impressive" performance on the ACT, Superintendent Mayo wrote, *inter alia*:

> I do want to inform you that Mr. Abraham has advised you correctly regarding the concern you have issued about the posting of your child's name for inclusion in the prestigious 30+ Club. Your child took the ACT under the legal name of Mary Wieland and that name is also the legal name reflected currently in ACS/AHS school records. The scoring report used by AHS to ascertain the names of students for the 30+ Club (and poster) was generated from ACT data base/report access based on the legal names of students at the time they took the ACT and who are currently enrolled at AHS. ACT did not provide accessibility to AHS for a score report with the name Max Wieland on it nor is there a student enrolled at AHS with that legal name, therefore, that name cannot be used on the poster to depict students who scored and qualified for the 30+ Club.

19.    Based on the foregoing rationale, Superintendent Mayo informed Plaintiff that either Max's "dead name" Mary would remain on the posters honoring students' accomplishments, or his name would be removed altogether. Superintendent Mayo wrote, "Please know that the school has not made any errors in displaying your child's legal name on the poster; however, since this has caused an issue for you, then the school will show you the consideration of having your child's name removed. If that is your desire, please send that written request to Mr. Abraham so that he can honor that request no later than Monday, August 28, 2023 @7:30 a.m. If he does not hear from you by then, your child's name will remain on the poster and displayed."

20.    Superintendent Mayo concluded his email to Plaintiff by addressing her suggestion of a meeting with him and/or the Defendant Board of Education:

> As far as a face-to-face meeting with me, I am always happy to meet with parents if there is additional information you would like to share about this topic or another that is appropriate for me to become involved in providing you have gone through the proper chain of authority. However, I don't have the time to sit and rehash situations that have already been addressed regardless of your satisfaction or dissatisfaction with the decision. I cannot speak to the schedules of board members, so if you would like to meet with a board member you will need to contact each of them. They may or may not agree to meet as board members can only meet individually as they are not able to render opinions about school business, outside a public board meeting, in the presence of another board member.

21.    On Saturday August 26, 2023, again using her personal email address since she was corresponding as a parent of a student at Arlington High School and not in her capacity as an employee, Plaintiff emailed a reply to Superintendent Mayo. In her reply email, Plaintiff illustrated the flaws in Superintendent Mayo's logic. She pointed out other instances in which students were identified by chosen nicknames and not by their formal registered names. She pointed out that even Superintendent Mayo used a preferred nickname "Jeff" and not his formal name "Jeffrey" for his official school district email address, although Max was forced to use his "dead name" of Mary for his school email address. She pointed out other instances where the school district had in

the past used Max's chosen name when he received other honors such as the All West Honors Chorus or the All-State Honors Chorus, using those as examples in which the school district had been willing to allow use of Max's chosen name instead of his "dead name" on "unofficial" documents. Based on these points, Plaintiff insisted that Superintendent Mayo and Arlington Community Schools "are targeting my transgender child." Plaintiff concluded her email to Superintendent Mayo:

> I believe you can apply your "policy" with equity in one of two ways: Place the preferred name of Max Wieland on the aforementioned posters or place only the legal names of all students on all sports rosters, MaxPreps rosters, district social media communications, etc. Please send your written decision to me no later than Monday, August 28, 2023 @6:45 a.m. (before I am required to be on duty at my job), so that I may then meet your imposed deadline for our answer for Mr. Abraham.

22.    Superintendent Mayo sent a reply to Plaintiff at approximately 9:45 a.m. on Tuesday August 29, 2023. Superintendent sent the reply more than 24 hours after the deadline he had imposed for Plaintiff to decide whether Max would continue to be identified by his "dead name" Mary on the posters honoring his ACT achievement or have the acknowledgement of his achievement removed from the posters altogether. Instead of addressing Plaintiff's concerns that Plaintiff expressed in her capacity as Max's parent, Superintendent Mayo conflated Plaintiff's expression of concerns about the treatment of her child with Plaintiff's employment status and wrote:

> Thank you for your response to my email, however, I must say I was taken aback by the tone and disrespect of your reply. In the 10 years of working in this district, and frankly my entire 36-year career in education, mostly as an administrator, I have never been spoken to in this way by a parent, much less a parent who is also an employee of the district. The insinuations about and attack to "my logic," the all caps and bold text to underline your distaste with the decision, and the imposed deadline you gave me, your employer, are inappropriate and should not be the way in which you raise your concerns.

8

I am aware you are dissatisfied with the decision regarding the usage of your child's preferred name, and as you indicated in your previous communications, you are following an official process to have those concerns heard by another entity. I respect your right as a parent to do this. However, you are also an employee in ACS, so it is my expectation that you remain respectful and, at all times, adhere to the code of employee ethics as outlined in Policy 5.600 Teacher Code of Ethics and ACS Employee Responsibilities and Ethics.

As a long-time administrator, I have always told my teachers and employees to not reply to parents who are disrespectful in their tone or behavior, so I certainly will not tolerate it myself as superintendent. Please note for future correspondences, I will not respond to your email if it is presented as such, as I would expect you as a teacher to do the same if you were approached by a parent in similar regard.

The August 2023 email exchanges described in the foregoing paragraphs are attached as collective **Exhibit 3**.

23.    At about the same time Superintendent Mayo was sending his August 29 email, Plaintiff suffered an injury while at work at Arlington High School. Plaintiff was observing another teacher's class when she fell from the chair on which she was sitting. Plaintiff had recently undergone surgery on her shoulder, and her arm was in a sling while she recovered from surgery. The teacher's chair in the classroom Plaintiff was observing was on wheels. When the chair moved, Plaintiff was unable to use the arm that was in a sling to catch herself. Plaintiff struck her head as she fell and then landed on her already-injured shoulder. In addition to the pain of landing on her shoulder, Plaintiff suffered a concussion from striking her head as she fell.

24.    As Plaintiff laid on the classroom floor injured and crying, some students began laughing at her. One student was reported by a fellow student to have been laughing "hysterically" at Plaintiff while handing a cell phone to another student to "take a video, take a video." Although Plaintiff has no recollection of saying anything inappropriate in that moment, some students reported hearing her say, "it's not funny a##hole."

9

25.    Plaintiff was unable to get herself up from the floor. Some students sought help for her. Another teacher and a school nurse came to Plaintiff's aid. After several minutes they were able to help Plaintiff to a sitting position. Plaintiff was taken by wheelchair to a colleague's car, and the colleague drove Plaintiff to the emergency room at a nearby hospital where she was examined for possible damage to her shoulder and treated for a concussion.

26.    Because of the injuries suffered in her fall, Plaintiff was to remain out of work until September 5, 2023. On August 31, 2023, Allison Clark, Chief of Human Resources for Arlington Community Schools, instructed Plaintiff that she was not to return to work on September 5 and should report to Clark instead. When Plaintiff asked why, Clark responded that her instruction grew out of Plaintiff's use of the term "a##hole" at school. Clark further instructed Plaintiff that neither Plaintiff nor her representatives or anyone acting on her behalf were to speak to any Arlington High School student or their parents or any Arlington High School staff member about the matter.

27.    On September 5, 2023, Plaintiff received a notice of charges upon which Superintendent Mayo intended to seek Plaintiff's dismissal from her position as a tenured teacher in the Arlington Community Schools, ostensibly because she uttered the term "a##hole" when students were laughing, at least one "hysterically," as she was lying in the floor in pain following a fall onto her already-injured shoulder and in which she suffered a concussion. Superintendent Mayo charged Plaintiff with unprofessional conduct and insubordination. A copy of the dismissal charges is attached as **Exhibit 4**. Plaintiff was suspended from her position pending the outcome of proceedings related to the dismissal charges. In addition, Superintendent Mayo or those working under his direction sent notice of the dismissal charges to the teacher licensing office of the Tennessee State Board of Education, resulting in jeopardy to Plaintiff's teaching career and a

"hold" on Plaintiff's license that will impair her ability to find a position as a teacher in another school system.

28.    On September 14, 2023, the Defendant Board of Education met and determined that the charges were sufficient, if true, to warrant Plaintiff's dismissal. The following day, Superintendent Mayo sent Plaintiff notice of the Defendant Board of Education's determination [**Exhibit 5**].

29.    Plaintiff requested a hearing on the dismissal charges. Pursuant to Tenn. Code Ann. § 49-5-512(a)(2), Superintendent Mayo named R. Dale Thomas, an attorney from Jackson, Tennessee, to serve as the "impartial" hearing officer. "Impartial" is defined in the Tenure Law to mean that the selected hearing officer has no history of employment with the particular school board or director of schools that engages him as a hearing officer and no relationship with any board member, the teacher, or representatives of the teacher. Mr. Thomas is a member of the Tennessee Council of School Board Attorneys (TCSBA), an organization of attorneys who represent public school boards across Tennessee. However, he satisfied the narrow definition of "impartial" in the Tenure Law.

30.    Mr. Thomas conducted a hearing on Superintendent Mayo's charges against Plaintiff on November 14, 2023. During the hearing, Plaintiff offered testimony that described her August 2023 email exchanges with Mr. Abraham and Superintendent Mayo as described above, and the email exchanges attached hereto as collective Exhibit 3 were introduced into the record of that hearing as Exhibit 24.

31.    On December 22, 2023, Mr. Thomas rendered his decision, finding that the evidence in the record supported Superintendent Mayo's recommendation to dismiss Plaintiff for unprofessional conduct [**Exhibit 6**].

32.     Plaintiff appealed Mr. Thomas's decision to Defendant Board of Education pursuant to Tenn. Code Ann. § 49-5-512(c). Upon information and belief, the record of the hearing before Mr. Thomas was transmitted to the members of Defendant Board of Education for Defendant's consideration in deciding the appeal. Defendant Board of Education therefore had before it Plaintiff's testimony about her complaints of discrimination on behalf of her child Max as well as copies of the email exchanges Plaintiff had with Mr. Abraham and Superintendent Mayo about those complaints of discrimination.

33.     On January 31, 2024, Defendant Board of Education terminated Plaintiff's employment effective immediately [**Exhibit 7**].

### Causes of Action

### A. Retaliation in violation of Title IX.

34.     Defendant Board of Education terminated Plaintiff's employment in retaliation for Plaintiff's complaints of discrimination by officials of the Arlington Community Schools against Plaintiff's child Max. Plaintiff was an excellent teacher. Even if Plaintiff did use a vulgar word in the presence of students on August 29, 2023, that singular use of one vulgar term, at a vulnerable moment when Plaintiff was seriously injured, did not warrant the extreme consequence of termination.

35.     When Defendant Board of Education's statutory agent Superintendent Mayo brought dismissal charges against Plaintiff, and when Defendant Board of Education dismissed Plaintiff, Plaintiff had engaged in protected opposition to Title IX discrimination against her child Max. Plaintiff's exercise of her protected rights was known to Defendant Board of Education and to Defendant's statutory agent Superintendent Mayo. Plaintiff was subjected to the adverse employment action of termination subsequent to or contemporaneous with her protected activity.

There was a causal connection between Plaintiff's protected activity and the adverse employment action.

36.    Superintendent Mayo was unhappy with Plaintiff over Plaintiff's complaints of discrimination against her child Max and therefore seized upon her purported use of the word "a##hole" as an excuse to retaliate against her for those complaints by bringing dismissal charges against her. Defendant Board of Education facilitated the retaliation by its statutory agent Superintendent Mayo and engaged in its own retaliation when it dismissed Plaintiff for unprofessional conduct despite knowledge of the unusual circumstances surrounding plaintiff's alleged singular use of one modestly vulgar term and despite knowledge that the decision by Superintendent Mayo to seek Plaintiff's termination had occurred subsequent to or contemporaneous with her protected complaints of discrimination against her child. The termination of Plaintiff, an excellent veteran teacher, for a single verbal misstep at a moment when she had been seriously injured was a pretext to mask Defendant's retaliatory motive.

37.    By retaliating against Plaintiff because of her complaints of discrimination against her child Max, Defendant discriminated against Plaintiff in violation of Title IX.

**B.  Tenure Law.**

38.    Superintendent Mayo, the hearing officer, and Defendant determined that Plaintiff's use of the single vulgar term "a##hole" on one occasion just after she suffered a serious injury was contrary to the teacher code of ethics in Tenn. Code Ann. § 49-5-1003 and therefore constituted unprofessional conduct justifying Plaintiff's termination.

39.    Tenn. Code Ann. § 49-5-501 defines "conduct unbecoming to a member of the teaching profession," synonymous with "unprofessional conduct," by examples. One of those

13

examples is "[d]isregard of the teacher code of ethics in part 10 of this chapter, in such manner as to make one obnoxious as a member of the profession."

40. Plaintiff's utterance of a single vulgar term, at a time when she had just been seriously injured and one or more of the high school students in the class laughed "hysterically" at her and wanted to make her injury the subject of a cell phone video, did not amount to a "disregard of the teacher code of ethics."

41. Plaintiff's utterance of a single vulgar term, at a time when she had just been seriously injured and one or more of the high school students in the class laughed "hysterically" at her and wanted to make her injury the subject of a cell phone video, did not make Plaintiff "obnoxious as a member of the profession."

42. Plaintiff's utterance of a single vulgar term, at a time when she had just been seriously injured and one or more of the high school students in the class laughed "hysterically" at her and wanted to make her injury the subject of a cell phone video, was not "unprofessional conduct" as that term is defined in the Tenure Law.

43. Defendant's termination of Plaintiff was arbitrary, capricious, contrary to law, in violation of Plaintiff's statutory rights, and not justified by the facts.

Plaintiff therefore prays for the following relief for her claim of retaliation in violation of Title IX:

1. That process be served upon Defendant, requiring Defendant to answer;

2. That, following a trial on the merits, the Court declare that Defendant's termination of Plaintiff was unlawful in violation of Title IX because it was taken in retaliation for Plaintiff's protected activity of complaining about discrimination against her child Max;

3. That the Court order Defendant to reinstate Plaintiff and to pay Plaintiff compensatory damages, including but not limited to lost compensation and benefits, sustained by Plaintiff on account of Defendant's unlawful retaliation in violation of Title IX, in an amount to be determined at trial;

4. That the Court enjoin Defendant from further retaliating against Plaintiff on account of Plaintiff's complaints of discrimination against her child;

5. That Plaintiff be awarded her costs including a reasonable attorney's fee under 42 U.S.C. § 1988; and

6. For such further relief as the Court may deem just.

Plaintiff prays for the following relief for her supplemental state law claim under the Tenure Law:

1. That the Court exercise supplemental jurisdiction over Plaintiff's state law claim under the Tenure Law;

2. That the Court issue a writ of certiorari requiring Defendant to file the written record of the hearing on the charges against Plaintiff together with any evidence or exhibits submitted at the hearing pursuant to Tenn. Code Ann. § 49-5-513.

3. That, following a trial on the merits, the Court declare that Plaintiff was not guilty of "unprofessional conduct" and that Defendant's termination of Plaintiff was arbitrary, capricious, contrary to law, in violation of Plaintiff's statutory rights, and not justified by the facts;

4. That the Court order Defendant to rescind Plaintiff's termination, reinstate Plaintiff, and pay Plaintiff her full salary in accordance with the Tenure Law;

5. For such further relief as the Court may deem just.

15

/s/ Richard L. Colbert
Richard L. Colbert, No. 9397
Sarah M. Ingalls, No. 38383
THOMPSON BURTON PLLC
One Franklin Park
6100 Tower Circle
Suite #200
Franklin, TN 37067
(615) 465-6000
rcolbert@thompsonburton.com
singalls@thompsonburton.com
*Attorneys for Plaintiff Cynthia Wieland*

16

## OATH

I hereby declare, under penalty of perjury, that the facts alleged in this Complaint are true to the best of my knowledge, except where alleged on information and belief, and as to those I am informed and believe them to be true.

Cynthia Wieland