IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

CYNTHIA WIELAND,

     Plaintiff,

v.                                            No. 2:24-cv-02128-SHM-atc

ARLINGTON COMMUNITY SCHOOLS
BOARD OF EDUCATION,

     Defendant.

---

ORDER DENYING MOTION FOR PARTIAL DISMISSAL

---

Plaintiff Cynthia Wieland, a former tenured teacher at Arlington High School ("AHS"), was involuntarily discharged by Defendant Arlington Community Schools Board of Education. On February 28, 2024, Plaintiff filed this action alleging that Defendant (1) terminated her employment in retaliation for her complaints about AHS's discrimination against her transgender son, in violation of Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. §§ 1681, *et seq.*; and (2) revoked her tenure in violation of the Tennessee Tenure Act, Tenn. Code Ann. §§ 49-5-501, *et seq.* (ECF No. 1.)

Before the Court is Defendant's November 22, 2024 Motion for Partial Dismissal ("the Motion"), seeking to dismiss Plaintiff's

Title IX claim.  (ECF Nos. 12, 13.)  For the reasons stated below, the Motion is **DENIED**.

I.  **BACKGROUND**

   A.  **Factual Background**

   The following facts are taken from Plaintiff's complaint. (ECF No. 1.)  For purposes of deciding the Motion, the Court accepts all factual allegations in the complaint as true.  See Miller v. Currie, 50 F.3d 373, 377 (6th Cir. 1995); see also Mertik v. Blalock, 983 F.2d 1353, 1356 (6th Cir. 1993).

   Plaintiff began her employment as a theater teacher at AHS in August 2018.  (ECF No. ¶ 8.)  She attained tenure in August 2020 and continued teaching theater until her involuntary discharge on January 31, 2024.  (Id.)  During her tenure, Plaintiff received multiple teaching awards, including recognition as an "Inspiring Educator" and "Teacher of the Year."  (Id., Ex. 6.)

   Plaintiff is the mother of Max Wieland, a student at AHS. (Id. at ¶ 10.)  Max was born on July 7, 2006, as Mary Elizabeth Wieland.  (Id.)  During the eighth grade, Max came out as a transgender male and informed Plaintiff of his intent to live as a boy.  (Id.)  Since then, Max has ceased using the name Mary, which he identifies as his "dead name."  (Id. at ¶ 11.)

On April 6, 2023, Plaintiff emailed AHS principal Shannon Abraham to report incidents of alleged sex discrimination against Max and to request corrective action. (Id.) In her email, Plaintiff said that Max had been denied access to the male restroom and was repeatedly addressed as "Mary" by teachers during class attendance, despite his insistence on being called Max. (Id.) Plaintiff said that AHS officials had informed her that Max would be referred to as "Mary" when called to receive his diploma at graduation, based on the name on his birth certificate. (Id.) Plaintiff urged the principal to instruct AHS officials to cease using Max's birth name in class and at graduation, explaining that its continued use had caused him severe emotional distress and physical illness. (Id.)

The principal denied Plaintiff's request. On April 9, 2023, Plaintiff filed a Title IX complaint with the U.S. Department of Education's Office for Civil Rights ("OCR"), alleging that Defendant had engaged in sex discrimination against Plaintiff's son, Max. (Id. at ¶ 12, Ex. 1.) On May 16, 2023, the OCR acknowledged receipt of the complaint and initiated an investigation into Defendant, providing notice to Defendant's statutory agent, Superintendent Jeffery Mayo. (Id., Ex. 2.)

On August 24, 2023, AHS officials displayed five large posters honoring students who had achieved high scores on the American

3

College Test ("ACT"). (Id. at ¶¶ 13-14.) Max was among the students recognized, but the posters identified him by his birth name, "Mary." (Id. at ¶ 14.) On discovering the posters, Plaintiff again contacted the principal to complain. (Id.) In response, the principal gave Plaintiff two options: either the posters would remain unchanged with Max identified as "Mary," or Max's name would be removed entirely. (Id. at ¶ 16.) The principal explained that the decision was based on the school's naming policy, which provided that a student's "preferred name could not be used on student records." (Id.)

The next day, Plaintiff emailed the principal to object to the decision, copying Superintendent Mayo. (Id. at ¶ 17.) In her email, Plaintiff argued that the ACT recognition posters were not "student records" and asked that the posters be revised to reflect Max's preferred name. (Id., Ex. 3.) She described the posters as "an assault for my child" and alleged that they were "placed intentionally so they would be visible." (Id.)

Later that day, Superintendent Mayo responded:

Your child took the ACT under the legal name Mary Wieland and that name is also the legal name reflected currently in the ACS/AHS school records. The scoring report used by AHS to ascertain the names of students for … [the] poster … was generated from the ACT database … based on the legal names of students at the time they took the ACT and who are currently enrolled at AHS. ACT did not provide accessibility to AHS for a score report with the

4

name Max Wieland on it, nor is there a student enrolled
at AHS with that legal name[.]  [T]herefore, that name
cannot be used on the poster[.]"  (Id.)

On August 26, 2023, Plaintiff responded to the
Superintendent.  (Id. at ¶ 20.)  In her response, Plaintiff
asserted that the school applied its naming policy inconsistently.
She pointed out that the school's athletics website listed student
athletes by their preferred names, rather than their birth names.
(Id. at ¶ 21.)  She also noted the Max had been recognized under
his preferred name for similar academic honors.  (Id.)  Based on
those examples, Plaintiff argued that the school was "targeting
[her] transgender child."  (Id.)  She asked that the school use
students' birth names consistently in all public materials or
permit Max's preferred name to appear on the ACT recognition
posters.  Plaintiff requested a response by August 28, 2023, at
6:45 a.m.  (Id.)

On August 29, 2023, Superintendent Mayo replied.  (Id. at ¶
22.)  In his reply, he expressed dissatisfaction with the "tone
and disrespect" of Plaintiff's prior email, saying that in his
"entire 36-year career in education," he had "never been spoken to
this way by a parent, much less a parent who is also an employee
of the district."  (Id.)  He characterized Plaintiff's email as a
personal attack on his logic and character.  (Id.)  Superintendent
Mayo admonished Plaintiff for failing to comply with the district's

employee code of ethics, and said he would disregard any future correspondence if it were similarly disrespectful.  (Id.)

Later the same day, Plaintiff suffered a physical injury at work.  (Id. at ¶ 23.)  While supervising a class, she fell from a rolling desk chair, struck her head on a bookshelf, and landed on a shoulder that had recently undergone surgery.  (Id., Ex. 6.) She sustained a concussion and re-injured her shoulder.  (Id.) After she had fallen, some students allegedly laughed at her. (Id.)  In response, Plaintiff said: "It's not funny, asshole." (Id. at ¶ 24.)  At least seven students in the classroom corroborated in written statements that Plaintiff had used the expletive in reaction to the students' laughter.  (Id.)  Plaintiff remained on sick leave until September 5, 2023.  (Id. at ¶ 25.) While on leave, the AHS Chief of Human Resources emailed Plaintiff, directing her to report to the Central Office on her return.  (Id. at ¶ 26.)

On September 5, 2023, Plaintiff met with the Chief of Human Resources, who informed her that she was suspended from her position because Superintendent Mayo had filed charges with the school district's Board of Education (the "Board").  (Id. at ¶ 27.)  The charges – "unprofessional conduct and insubordination" – arose from the August 29, 2023 incident in which Plaintiff allegedly called students "assholes" in class.  (Id.)  Plaintiff

was also informed that Superintendent Mayo had sent notices of the charges to the Tennessee State Board of Education's Office of Educator Licensure and requested the suspension of Plaintiff's teaching license. (Id.)

On September 14, 2023, the Board convened and decided that, if the charges were proven, they would be sufficient to warrant Plaintiff's termination. (Id. at ¶ 28.) Superintendent Mayo sent Plaintiff notice of the Board's decision the following day. (Id.) Plaintiff subsequently requested a hearing. (Id. at ¶ 29.) Pursuant to the Tennessee Tenure Act, Tenn. Code Ann. § 49-5-512, the Board appointed R. Dale Thomas, a member of the Tennessee Council of School Board Attorneys, to serve as hearing officer. (Id.)

On December 22, 2023, the hearing officer issued a decision recommending Plaintiff's termination. (Id. at ¶ 31.) He found that, although Plaintiff's single, isolated use of profanity did not amount to insubordination, it constituted "unprofessional conduct" capable of inflicting "mental or emotional harm to students," which demonstrated her "unfitness to teach." (Id., Ex. 6.) Plaintiff appealed the decision. (Id. at ¶ 32.) On January 31, 2024, the Board adopted the hearing officer's recommendation and formally terminated Plaintiff's employment. (Id. at ¶ 33.)

7

**B.    Procedural Posture**

On February 28, 2024, Plaintiff filed this action.  She alleges that she was terminated in retaliation for opposing the school's discriminatory treatment of her son, in violation of Title IX.  (Id. at ¶¶ 34-37.)  She also alleges that the Board's decision to revoke her tenure was "arbitrary and capricious," in violation of her rights under the Tennessee Tenure Act.  (Id. at ¶¶ 38-43.)

On April 9, 2024, Defendant filed an answer denying Plaintiff's allegations and denying that Superintendent Mayo acted with retaliatory intent.  (ECF No. 11.)  On November 22, 2024, Defendant filed the instant Motion, seeking dismissal of Plaintiff's Title IX claim.  (ECF No. 12.)  Defendant argues that, even assuming all allegations are true, Plaintiff's Title IX claim fails as a matter of law because Title IX only prohibits discrimination "on the basis of sex," not "sexual orientation and gender identity."  (ECF No. 13.)

On January 17, 2025, Plaintiff filed a response in opposition.  (ECF No. 17.)  Plaintiff argues that Defendant's interpretation of Title IX is inconsistent with the Supreme Court's decision in Bostock v. Clayton Cnty., which held that discrimination based on "homosexuality or transgender status" constitutes discrimination "because of sex."  590 U.S. 644, 665 (2020).  Although Bostock arose under Title VII, Plaintiff argues that the Sixth Circuit

generally applies Title VII principles in the Title IX context. (ECF No. 17.)

On January 31, 2025, Defendant filed a reply, asserting that Bostock is inapplicable because Title VII and Title IX employ materially different statutory language. (ECF No. 18.) Therefore, Defendant argues, the reasoning in Bostock does not control the interpretation of Title IX. (Id.)

The Motion is now fully briefed and ripe for adjudication.

## II.  JURISDICTION

The Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts claims under Title IX. The Court exercises supplemental jurisdiction over Plaintiff's Tennessee Tenure Act claims pursuant to 28 U.S.C. § 1367, because her state law claims and her federal claims share a "common nucleus of operative facts." Packard v. Farmers Ins. Co. of Columbus Inc., 423 Fed. Appx. 580, 583 (6th Cir. 2011); see also Royal Canin U.S.A., Inc. v. Wullschleger, 604 U.S. 22, 27 (2025).

## III. STANDARD OF REVIEW

When evaluating a motion to dismiss under Rule 12(b)(6), courts must "construe the complaint in the light most favorable to the plaintiff [and] accept all factual allegations as true." Payne

v. Secretary of Treasury, 73 Fed. Appx. 836, 837 (6th Cir. 2003);
see also League of United Latin Am. Citizens v. Bredesen, 500 F.3d
523, 527 (6th Cir. 2007).  Courts "need not accept as true legal
conclusions or unwarranted factual inferences."  Commercial Money
Center, Inc. v. Illinois Union Ins. Co., 508 F.3d 327, 336 (6th
Cir. 2007); see also JP Morgan Chase Bank, N.A. v. Winget, 510
F.3d 577, 582 (6th Cir. 2007).  Courts may consider "matters of
public record, orders, items appearing in the record, and exhibits
attached to the complaint," as well as "documents that a defendant
attaches to a motion to dismiss … if referred to in the complaint
and … central [to the] claim."  Amini v. Oberlin College, 259 F.3d
493, 502 (6th Cir. 2001).

    To survive a motion to dismiss, the complaint must contain
sufficient facts to "state a claim to relief that is plausible on
its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  A claim
is plausible when the alleged facts "allow the court to draw the
reasonable inference that the defendant is liable for the
misconduct alleged."  Iqbal, 556 U.S. at 678.  Although the
complaint is not required to include "detailed factual
allegations," Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555
(2007), it must assert "more than an unadorned, the-defendant-
unlawfully-harmed-me accusation."  Iqbal, 556 U.S. at 678.  A
complaint may be dismissed only if "it is clear that the plaintiff

can prove no set of facts consistent with the allegations that would entitle him to relief." <u>Flanory v. Bonn</u>, 604 F.3d 249, 252-53 (6th Cir. 2010).

## IV.  ANALYSIS

### A.    Title IX Retaliation Standard

Title IX prohibits sex discrimination by recipients of federal education funding.  <u>See</u> <u>State of Tenn. v. Dept. of Educ.</u>, 104 F.4th 577, 584 (6th Cir. 2024); <u>see also</u> <u>Gebser v. Lago Vista Independent Sch. Dist.</u>, 524 U.S. 274, 280 (1998).  The statute provides:

> No person in the United States shall, *on the basis of sex*, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a) (emphasis added).

Title IX also forbids retaliation against individuals who oppose sex discrimination.  In <u>Jackson v. Birmingham Bd. of Educ.</u>, the Supreme Court held that retaliation against a person who complains about sex discrimination is itself a form of intentional sex discrimination prohibited by Title IX.  544 U.S. 167, 173-74 (2005).  Because retaliation is a form of disparate treatment, courts generally analyze Title IX retaliation claims under the

11

framework used for retaliation claims brought under Title VII.
See Goldblum v. Univ. of Cincinnati, 62 F.4th 244, 251 (6th Cir.
2023); see also Nelson v. Christian Bros. Univ., 226 Fed. Appx.
448, 454 (6th Cir. 2007) ("[C]ourts have looked to Title VII … as
an analog for the legal standards in both Title IX discrimination
and retaliation claims.").

A Title IX retaliation claim may be proven by direct or
circumstantial evidence. See Doe v. Belmont Univ., 367 F.Supp.3d
732, 756 (M.D. Tenn. 2019). Where, as here, a plaintiff relies on
circumstantial evidence, courts apply the burden-shifting
framework set forth in McDonnel Douglas Corp. v. Green, 411 U.S.
792 (1973). To recover under that framework, the plaintiff must
first establish a prima facie case of retaliation by showing:

(1) she engaged in "protected activity";

(2) the defendant "knew of the protected activity";

(3) she suffered an "adverse school-related action"; and

(4) a "causal connection exists" between the protected
activity and the adverse action.

Doe v. Univ. of Ky., 111 F.4th 705, 716 (6th Cir. 2024) (citing
Bose v. Bea, 947 F.3d 983, 988 (6th Cir. 2020)); see also Gordon
v. Traverse City Area Pub. Schs., 686 Fed. Appx. 315, 320 (6th
Cir. 2017).

The burden of establishing a prima facie case is "easily met." Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir. 2000). Once a plaintiff satisfies that burden, the burden shifts to the defendant to articulate a "legitimate, nondiscriminatory reason for its action." Gordon, 686 Fed. Appx. at 320. If the defendant does, the burden shifts back to the plaintiff to demonstrate that the proffered reason is pretextual. See id.

At the pleading stage, analogous Title VII cases establish that a Title IX plaintiff is not required to establish conclusively each element of retaliation to survive a motion to dismiss. See Bar v. Kalitta Charters II, LLC, No. 21-1739, 2022 WL 3042844, at *3 (6th Cir. Aug. 2, 2022). A plaintiff need not plead a prima facie case. Rather, the complaint need only "allege sufficient 'factual content' from which a court, informed by its 'judicial experience and common sense,' could 'draw the reasonable inference' that" the defendant violated Title IX. Keys v. Humana, Inc., 684 F.3d 605, 610 (6th Cir. 2012) (quoting Iqbal, 556 U.S. at 678-79) (applying the standard to a Title VII claim). The Supreme Court has said that the McDonnell Douglas framework is "an evidentiary standard, not a pleading requirement," and that "the ordinary rules for assessing the sufficiency of a complaint apply." Swierkiewicz v. Sorema N.A., 534 U.S. 506, 510-11 (2002). To withstand dismissal, Plaintiff need only plead sufficient facts

which, accepted as true, permit a factfinder to reasonably infer that each element of Plaintiff's Title IX retaliation claim is met. See Primm v. Dept. of Hum. Servs., No. 16-6837, 2017 WL 10646487, at *2 (6th Cir. Aug. 17, 2017); see also Serrano v. Cintas Corp., 699 F.3d 884, 897 (6th Cir. 2012).

**B.    Protected Activity**

For purposes of the Motion, the parties do not dispute the second, third, and fourth elements of Plaintiff's Title IX retaliation claim.[1] The complaint adequately pleads that Defendant knew of Plaintiff's objections; that her termination was an adverse school-related action; and that there is a causal connection between her objections and her termination. The only contested issue is whether Plaintiff's conduct – objecting to the school's refusal to use her son Max's preferred name consistent with his

---

[1] Defendant's Motion for Partial Dismissal does not address all four elements of Plaintiff's Title IX retaliation claim. (ECF No. 13.) The Motion focuses solely on the "protected activity" element, asserting that Plaintiff "fail[ed] to show entitlement to relief" because she "did not complain about conduct prohibited by Title IX." (Id.) Plaintiff's Response addresses all four elements of a Title IX retaliation claim and argues that her allegations adequately support each element. (ECF No. 17.) Defendant's Reply continues to address only the "protected activity" element. (ECF No. 18.) Because Defendant has not responded to Plaintiff's arguments about the second, third, and fourth elements, the Court deems those elements undisputed. See Doe v. Bredesen, 507 F.3d 998, 1007-08 (6th Cir. 2007); see also ARJN #3 v. Cooper, 517 F.Supp.3d 732, 750 (M.D. Tenn. 2021)("Where a party fails to respond to an argument in a motion to dismiss, the Court assumes he concedes this point and abandons the claim.").

gender identity – qualifies as a "protected activity" under Title
IX.

Although the statute does not define "protected activity,"
courts have interpreted the term to encompass efforts to oppose,
complain about, or otherwise challenge acts or policies that
discriminate "on the basis of sex." See Belmont Univ., 367
F.Supp.3d at 757 (citing Jackson, 544 U.S. at 183); see also Doe
v. Univ. of Tenn., 186 F.Supp.3d 788, 809 (M.D. Tenn. 2016).  To
qualify as "protected activity," the challenged conduct must
involve "intentional sex discrimination." Goldblum, 62 F.4th at
253.  Vague or generalized allegations of unfair treatment are
insufficient. See id. (citing Yazdian v. ConMed Endoscopic Techs.,
Inc., 793 F.3d 634, 645 (6th Cir. 2015).

A plaintiff alleging Title IX retaliation need not be the
direct target of the underlying discrimination.  See Jackson, 544
U.S. at 179.  A person engages in a "protected activity" so long
as she complains about conduct that constitutes sex
discrimination, even if that discrimination is directed at someone
else.  See id.; see also Lipian v. Univ. of Mich., 453 F.Supp.3d
937, 966 (E.D. Mich. 2020).  "Where the complainant speaks out
about sex discrimination, … [t]he complainant is [her]self a victim
of discriminatory retaliation, regardless of whether [she] was the
subject of the original complaint." Jackson, 544 U.S. at 179.

To demonstrate that her objections constitute "protected
activity" under Title IX, Plaintiff must plausibly show that (1)
Defendant engaged in "intentional" discrimination, and (2) that
discrimination was "on the basis of sex." See Goldblum, 62 F.4th
at 253; see also 20 U.S.C. § 1681(a).

### 1.    Intentional Discrimination

Two forms of intent are often conflated in Title IX cases:
discriminatory intent and retaliatory intent. Discriminatory
intent refers to a defendant's motive for treating a person
differently on the basis of sex. Retaliatory intent refers to a
defendant's motive for taking adverse action against a plaintiff
for opposing that discrimination. See Jackson, 544 U.S. at 171.

To plausibly state a Title IX retaliation claim, a plaintiff
need not show that the defendant acted with retaliatory intent
against her personally. See id. at 179. Rather, it is sufficient
to demonstrate that the defendant intentionally discriminated
against another individual – here, Plaintiff's son, Max – and that
the plaintiff suffered an adverse action for opposing that
discriminatory conduct. See id.; see also Allen v. Escanaba Area
Pub. Schs., No. 2:23-cv-200, 2025 WL 1328799, at *13 (W.D. Mich.
May 6, 2025) (holding that a mother alleging Title IX retaliation
for protesting a school's disparate treatment of her child must

plausibly show that the school acted with discriminatory intent against the child).

Discriminatory intent may be established in two ways: by demonstrating either "discriminatory animus" or "deliberate indifference." See Horner v. Ky. High Sch. Athletic Ass'n, 206 F.3d 685, 693 (6th Cir. 2000). Discriminatory animus may be inferred when the factual allegations permit a reasonable factfinder to conclude that "discrimination was at least a motivating factor" in the defendant's conduct. Clemons ex rel. T.W. v. Shelby Cnty. Bd. of Educ., 818 Fed. Appx. 453, 464 (6th Cir. 2020) (quoting Gohl v. Livonia Pub. Sch., 836 F.3d 672, 683 (6th Cir. 2016)); cf. Voltz v. Erie Cnty., 617 Fed. Appx. 417, 425 (6th Cir. 2015) ("Discriminatory animus … requires a showing of prejudice, spite, or ill will."). Alternatively, where an educational institution has a duty to prevent discriminatory harm, "deliberate indifference to known acts" of discrimination may suffice to show discriminatory intent. Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 643 (1999). If the institution is aware of sex discrimination and fails to act, or responds in a manner that is "clearly unreasonable in light of the known circumstances," its inaction may be deemed intentional discrimination. Vance v. Spencer Cnty. Pub. Sch. Dist., 231 F.3d 253, 260 (6th Cir. 2000) (citing Davis, 526 U.S. at 648).

17

A Title IX plaintiff need not present direct evidence to
establish discriminatory intent.  At the pleading stage, it is
sufficient if the complaint "pleads specific facts that support a
minimal plausible inference" of intent to discriminate "on the
basis of sex."  Doe v. Miami Univ., 882 F.3d 579, 588-89 (6th Cir.
2018) (quoting Doe v. Columbia Univ., 831 F.3d 46, 56 (2d Cir.
2016)).

Here, Plaintiff has alleged sufficient facts to support a
plausible inference that Defendant intentionally discriminated
against Max by refusing to acknowledge his preferred name – a core
aspect of his gender identity.  Despite Plaintiff's repeated
objections, the school continued to display Max's birth name on
the ACT recognition posters and at graduation, conduct that
allegedly caused Max severe mental and emotional harm.  (ECF No.
1, at ¶ 11.)  In Vance, the Sixth Circuit held that a school acts
with "deliberate indifference" when it "has actual knowledge that
its efforts to remediate [discrimination] are ineffective, and it
continues to use those same methods to no avail[.]"  Vance, 231
F.3d at 261; see also Stiles ex rel. D.S. v. Grainger Cnty., Tenn.,
819 F.3d 834, 849 (6th Cir. 2016).  Plaintiff has pled that
Defendant knew that Max was suffering harm as a result of the
continued display of his birth name on public-facing academic
materials, but took no corrective action.  (ECF No. 1.)  Those

facts support a plausible inference that Defendant acted with deliberate indifference.

Plaintiff has also sufficiently alleged that Defendant applied its naming policy inconsistently against Max. Other students, particularly student athletes, were permitted to use their preferred names on the school's website, despite the school's stated policy of displaying only legal names on public materials and student records. (ECF No. 1, at ¶ 21.) Max was denied the same treatment.

Superintendent Mayo justified the use of Max's birth name on the ACT recognition posters by saying that it was the name Max used to take the test, which appeared in the ACT database. (Id., Ex. 3.) However, he failed to address Plaintiff's argument that the school had previously allowed other students to use names other than their legal names in similar academic settings. (Id. at ¶ 21.) At this early juncture, Plaintiff has alleged sufficient facts to support a plausible inference that Defendant acted with discriminatory intent.

Defendant's argument that Superintendent Mayo did not intentionally retaliate against Plaintiff for advocating for her child is unavailing. As the Supreme Court made clear in Jackson, a plaintiff need not show that the defendant acted with retaliatory intent towards her. See Jackson, 544 U.S. at 179. Rather, it is

sufficient to show that the defendant intentionally discriminated against the person for whom she advocated, and that she suffered adverse consequences for her advocacy.  See id.  Plaintiff has satisfied that burden.

### 2.    On the Basis of Sex

The remaining question is whether the alleged discrimination against Max – based on his gender identity – constitutes discrimination "on the basis of sex" under Title IX.  That turns on whether Bostock, which held that Title VII's prohibition of discrimination "because of sex" encompasses gender identity and sexual orientation, applies with equal force in the Title IX context.  It does.

In Bostock, the Supreme Court held that Title VII, which forbids employment discrimination "because of sex," bars an employer from firing someone for simply being homosexual or transgender.  590 U.S. 644 (2020).  Writing for the majority, Justice Gorsuch explained that Title VII's "because of sex" language incorporates a "but-for" causation standard: if an individual's sex is a "but-for" cause of the adverse action, the statute is violated.  See id. at 656.  Applying that principle, the Court reasoned that discriminating against a homosexual or transgender person necessarily entails disparate treatment "because of sex," because the employer's decision hinges on "traits

or actions it [would] tolerate" in members of a different sex. Id. at 660. Because "homosexuality and transgender status are inextricably bound up with sex," discriminating on those grounds treats an individual differently "because of [that person's] sex." Id. at 661. Even accepting that "sex" in 1964 – the year Title VII was enacted – referred to "biological distinctions between male and female," the Court emphasized that the "but-for" standard applies to discrimination against homosexual and transgender individuals. Id. at 645. Unexpected applications of a broad statute do not narrow its ordinary meaning. See id. at 674 (citing Antonin Scalia & Bryan Garner, Reading Law: The Interpretation of Legal Texts 101 (2012)) (noting that unexpected applications of broad statutory language reflect only Congress's "presumed point [to] produce general coverage – not to leave room for courts to recognize ad hoc exceptions.").

Since Bostock, several circuits have interpreted Title IX's prohibition on sex discrimination to include gender identity and sexual orientation. In Grimm v. Gloucester Cnty. Sch. Bd., the Fourth Circuit held that a school's bathroom policy barring a transgender boy from using the male restroom constituted sex discrimination in violation of Title IX. 972 F.3d 586, 616 (4th Cir. 2020). Although Bostock addressed Title VII, the Fourth Circuit explained that Title VII precedents guide Title IX

analysis, consistent with its past practice and the Supreme Court's instruction to read Title IX alongside antidiscrimination statutes enacted as part of, or later amended into, the Civil Rights Act of 1964. See Grimm, 972 F.3d at 616 (citing Jennings v. Univ. of N.C., 482 F.3d 686, 695 (4th Cir. 2007)); see also Davis v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 651 (1999); Preston v. Virginia ex rel. New River Cmty. College, 31 F.3d 203, 206-07 (4th Cir. 1994) ("Title VII, and the judicial interpretation of it, provide a persuasive body of standards to which [courts] may look in shaping the contours of a private right of action under Title IX.").

The Seventh Circuit has extended Bostock's reasoning to Title IX, holding that a policy preventing transgender students from using bathrooms aligned with their gender identity constituted unlawful sex discrimination. See A.C. v. Metropolitan Sch. Dist. of Martinsville, 75 F.4th 760, 769 (7th Cir. 2023). The Ninth and Tenth Circuits have similarly interpreted Title IX's prohibition on sex discrimination to encompass gender identity. See Doe v. Horne, 115 F.4th 1083, 1107 (9th Cir. 2024); see also Dimas v. Pecos Independent Sch. Dist. Bd. of Educ., No. 23-2064, 2024 WL 1881076, at *8 n.9 (10th Cir. Apr. 30, 2024) ("For purposes of this appeal, we assume that under Title IX, discrimination on the basis of sexual orientation is sex-based discrimination.").

The Sixth Circuit has not addressed this issue directly.[2]  In
Tennessee v. Cardona, the Sixth Circuit expressed skepticism that
Bostock automatically controls in the Title IX context.  No. 24-
5588, 2024 WL 3453880, at *3 (6th Cir. Jul. 17, 2024).  The Sixth
Circuit, however, resolved that case on agency deference grounds,
rather than by construing the statutory phrase "on the basis of
sex."  See id. at *4.  Without reaching the merits, the Sixth
Circuit affirmed a preliminary injunction enjoining enforcement of
the Department of Education's 2021 rule on the ground that the
rule likely exceeded the agency's rulemaking authority.  See id.
at *2.  The rule would have expanded Title IX's coverage to include
"discrimination on the basis of sex stereotypes, sex
characteristics, pregnancy or related conditions, sexual
orientation, and gender identity."  Id. at *1 (citing 89 Fed. Reg.
33886).

In dicta, the Sixth Circuit observed:

---

[2] Although the Sixth Circuit has not yet addressed the applicability of
Bostock to Title IX claims, its pre-Bostock precedent directs courts to
look to Title VII jurisprudence when interpreting Title IX.  See, e.g.,
Tumminello v. Father Ryan High Sch., Inc., 678 Fed. Appx. 281, 284 (6th
Cir. 2017) ("The boundaries of 'on the basis of sex' have been more
extensively analyzed under Title VII jurisprudence, which often is
consulted when interpreting and applying Title IX."); Fuhr v. Hazel Park
Sch. Dist., 710 F.3d 668, 673 (6th Cir. 2013) ("[T]he standards
articulated by Title VII cases are sufficient to establish the applicable
legal framework [in Title IX].");  Nelson, 226 Fed. Appx. at 454
("Generally, courts have looked to Title VII … as an analog for the legal
standards in both Title IX discrimination and retaliation claims.").

> As to the relationship between Title VII and Title IX, the statutes use materially different language: discrimination "because of" sex in Title VII and discrimination "on the basis of" sex in Title IX.  See 42 U.S.C. § 2000e-2(a)(1); 20 U.S.C. § 1681(a).  In addition, the two statutes serve different goals and have distinct defenses.  For these reasons, it does not follow that principles announced in the Title VII context automatically apply in the Title IX context.

Cardona, 2024 WL 3453880, at *3 (citing Meriwether v. Hartop, 992 F.3d 492, 510 n. 4 (6th Cir. 2021)) (internal quotation marks omitted).

Defendant relies on the dicta in Cardona to argue that Bostock is inapplicable to Title IX because Title IX uses the phrase "on the basis of sex" rather than "because of sex."  However, Cardona did not announce a new rule of statutory interpretation.  Cardona held that, at the preliminary injunction stage, the Department of Education's 2021 rule – which expanded Title IX's reach to cover additional categories unrelated to biological sex – likely exceeded the agency's rulemaking authority.  Cardona cautioned against "automatically" importing Title VII principles into Title IX without analysis.  It did not decide whether Title IX's "on the basis of sex" language encompasses gender identity.  Cardona is not a decision excluding gender identity from the scope of Title IX.  It is an invitation for courts to engage in reasoned analysis.

In Bostock, the Supreme Court drew no distinction between the two statutory phrases at issue.  The Supreme Court used "on the basis of sex" and "because of sex" interchangeably.  See Bostock, 590 U.S. at 680 ("We can't deny that today's holding – that employers are prohibited from firing employees *on the basis of* homosexuality or transgender status – is the elephant [in the room].") (emphasis added); see id. at 658 ("[A]n employer who intentionally treats a person worse *because of* sex – such as by firing the person for actions or attributes it would tolerate in an individual of another sex – discriminates against that person in violation of Title VII.") (emphasis added).  The Court used "on the basis of" 49 times in contexts where it could have said "because of," suggesting that it perceived no material difference between the two.  Justice Alito's dissent, which focused on the original public meaning of "because of sex" at the time Title VII was enacted, treated "because of," "on account of," and "on the basis of" interchangeably.  See id. at 709 (Alito, J., dissenting).

The plain and ordinary meaning of the two phrases confirms their equivalence.  When Title VII was enacted, Congress understood that "the ordinary meaning of 'because of' is 'by reason of' or 'on account of.'"  Bostock, 590 U.S. at 644 (quoting Univ. of Tex. Southwestern Medical Center v. Nassar, 570 U.S. 338, 350 (2013) (citing 1 Webster's Third New International Dictionary 194 (1966);

1 <u>Oxford English Dictionary</u> 746 (1933); <u>The Random House Dictionary</u> <u>of the English Language</u> 132 (1966)).  That term conveys "but-for" causation, which "[i]n the language of law" means that "causation is established whenever a particular outcome would not have happened 'but for' the purported cause."  <u>Bostock</u>, 590 U.S. at 656.

The phrase "on the basis of" carried the same meaning when Title IX was enacted.  The American Heritage Dictionary of the English Language defined "basis" in 1969 as a "foundation upon which something rests," and "[t]he chief component of anything."  <u>The American Heritage Dictionary of the English Language</u> 60 (1969).  Although idiomatic phrases like "on the basis of" were not listed as independent entries, the meaning follows from the ordinary components "on," "the basis," and "of."  Because "basis" meant the foundation of reason, a phrase built on it naturally conveyed a causal relationship.  That meaning persists today: the Merriam-Webster Dictionary defines "on the basis of" as "according to," "because of," and "based on."  <u>Merriam-Webster Dictionary</u> (2025).  Under its most natural reading, discrimination "on the basis of sex" occurs whenever sex is a "but-for" cause of the challenged action.  Any other meaning would contradict ordinary usage and the Supreme Court's treatment of the phrases as interchangeable in <u>Bostock</u>.

Some out-of-circuit authorities have read "on the basis of sex" differently from "because of sex."  A court in the Southern District of Mississippi has declined to extend Bostock to Title IX on the ground that the phrases state different causation standards. See Tennessee v. Becerra, 739 F.Supp.3d 467, 479 (S.D. Miss. 2024). A court in the Northern District of Texas has held that Title IX's "on the basis of sex" language requires proof that "biological sex [was] *the* motivating factor," but that Title VII's "because of sex" language requires only "but-for" causation.  Neese v. Becerra, 640 F.Supp.3d 668, 684 (N.D. Tex. 2022) (emphasis added), rev'd on other grounds, 123 F.4th 751 (5th Cir. 2024).[3]  A court in the District of New Hampshire has acknowledged the phrases may imply different causation thresholds, but has declined to decide whether "motivating factor" is more or less stringent than "but-for" causation.  See Doe v. Trustees of Dartmouth College, 731 F.Supp.3d 222, 238 (D.N.H. 2024).  The question remains open in the Sixth Circuit.

---

[3] The court in Nesse distinguished between the "motivating factor" test and "but-for" causation test by suggesting that the latter implies a "derivative" causal relationship.  See Nesse, 640 F.Supp.3d at 684 ("For an action to occur 'on the basis of sex,' biological sex must be the motivating factor. 'On the basis of sex' does not connote a derivative, 'but-for causation' analysis like the Supreme Court reasoned 'because of sex' does.").  However, Nesse does not explain what "derivative" means in the context of Title IX, and the Supreme Court's decision in Bostock does not use the term "derivative" at all.

The Court need not resolve the issue here.  Even if Title IX
requires a "motivating factor" showing distinct from Title VII's
"but-for" causation, that difference goes only to the level of
proof.  Either way, Plaintiff's complaint alleges sufficient facts
from which a reasonable factfinder could infer the nexus between
sex and Defendant's conduct.  At the pleading stage, it is enough
to plead "specific facts that support a minimal plausible
inference" of intentional discrimination "on the basis of sex."
Miami Univ., 882 F.3d at 588-89.  Plaintiff has satisfied that
burden.

Defendant also cites the decision of a court in the Eastern
District of Tennessee, Tennessee v. U.S. Dept. of Educ., for the
proposition that the "on the basis of sex" language in Title IX
excludes gender identity.  615 F.Supp.3d 807 (E.D. Tenn. 2022).
That case does not control.  The court there declined to extend
Bostock to Title IX, noting that the Supreme Court "was careful to
narrow the scope of its holding" and that Bostock "did not sweep
beyond Title VII to other federal or state laws that prohibit sex
discrimination." Id. at 817 (quoting Bostock, 590 U.S. at 681)
(internal quotation marks omitted).  Like Cardona, Tennessee
addressed a challenge to the Department of Education's 2021 rule.
On appeal, the Sixth Circuit affirmed on the ground that the
Department likely exceeded its rulemaking authority, without

28

interpreting the "on the basis of sex" language in Title IX.  See
Tennessee v. U.S. Dept. of Educ., 104 F.4th 577 (6th Cir. 2024).
Tennessee does not foreclose the application of Bostock's
reasoning to Title IX.

The short of it is that a fair reading of "because of sex"
and "on the basis of sex" does not distinguish them.  That is
particularly true given that Title VII and Title IX are interpreted
together.  It was true in 1964 and 1972, and it is true today.

Defendant contends that Plaintiff must plead "actual
violation" of Title IX.  Plaintiff responds that it is sufficient
that she complained based on a "reasonable[,] good faith belief"
that Defendant discriminated "on the basis of sex."  See Yazdian,
793 F.3d at 646.  The Court need not resolve that question at this
juncture.  Whether the "actual violation" or "reasonable, good
faith belief" standard applies is better addressed after discovery
on a fuller record.  Under either standard, Plaintiff has plausibly
alleged conduct that, if true, states a Title IX retaliation claim
sufficient to survive a motion to dismiss.

## V.    CONCLUSION

For the foregoing reasons, Plaintiff has plausibly stated a
claim of Title IX retaliation.  Defendant's Motion for Partial
Dismissal (ECF Nos. 12, 13.) is **DENIED**.

**SO ORDERED** this 26th day of September, 2025.


_/s/  Samuel H. Mays, Jr._
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE